UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

QUICK CASH, INC.,                                                          Case No. 15-11800-t7

      Debtor.

YVETTE J. GONZALES, chapter 7 trustee,

      Plaintiff,

v.                                                                        Adv. No. 17-1051-t

TIMOTHY DELGADO, STACEY DELGADO,
PAT MATAYA, MATAYA CONSTRUCTION
CO., INC., GALLUP LUMBER & SUPPLY CO.,
RED MESA ELECTRIC ENTERPRISES, LLC,
ELKHORN CABINETS, LLC, REHOBOTH
CHRISTIAN SCHOOL, ONEMAIN FINANCIAL
F/K/A CITIFINANCIAL, SYNCHRONY BANK,
NEW YORK LIFE INSURANCE COMPANY,
FIDELITY AND GUARANTEE LIFE INSURANCE
COMPANY, and NAEL AL-ASSI,

      Defendants.

## **OPINION**

        The Court tried the merits of plaintiff's amended complaint against defendants Timothy and Stacey Delgado. Plaintiff seeks a judgment against the Delgados for the value of a large number of transfers made by the Debtor between July 2, 2013 and June 29, 2015. Her theory of recovery is that the transfers were to or for the benefit of the Delgados, the Debtor was insolvent when the transfers were made, and the Debtor did not receive reasonably equivalent value in exchange. In addition, one count relates to alleged preferential transfers. The Court, having

considered the trial evidence, the docket in this proceeding and the main case, and the relevant law, concludes that the trustee did not meet her burden of proving that Debtor was insolvent when the transfers were made. The Court therefore will enter judgment in the Delgados' favor on all counts.

I. FACTS

The Court finds:[1]

Debtor Quick Cash Inc. (Quick Cash), doing business as Cash Cow Loan Company, Cash Cow Furniture, and Cash Cow Tires & Service, is a New Mexico corporation headquartered in Gallup. Formed in 2003, Quick Cash is wholly owned by the Delgados. Quick Cash's operations included consumer lending, tax refund lending, a retail furniture business, and an automobile tire and service center. Most of Quick Cash's revenue came from high-interest purchase or loan contracts. Because of the nature of its business, Quick Cash was not "bankable." Mr. Delgado[2] dealt with this problem by seeking loans from friends and business associates to provide operating capital.

In 2013 Quick Cash had a $1.2 million profit. Around the end of 2013, Mr. Delgado was introduced by a friend to an owner of an Oklahoma corporation called Superior Fabrication Inc. (SFI).[3] The business relationship between Quick Cash and SFI apparently began when SFI considered lending money to Quick Cash for operating capital. After doing some research and auditing Quick Cash's operations, SFI expressed interest in merging with or acquiring Quick Cash.

---

[1] The Court takes judicial notice of its docket in this case. *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record.") (*abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001)).
[2] It does not appear that Mrs. Delgado was active in Quick Cash's management.
[3] SFI later changed its name to QCNM, Inc., but shall be referred to as SFI.

SFI's due diligence led it to conclude that Quick Cash was worth $13.5 million. At the beginning of 2014 Quick Cash signed a purchase agreement with SFI under which SFI would buy half of Quick Cash's stock for $6.5 million. The deal was set to close in May 2014. On January 3, 2014, in connection with the purchase agreement, Quick Cash borrowed $3.5 million from SFI. The understanding of the parties was that the loan would be forgiven when the sale closed. Quick Cash used the loan proceeds to retire $2.7 million of debt and to operate its business.

In May 2014, Mr. Delgado and his family went to Oklahoma to close the deal on SFI's purchase of one half of Quick Cash. The meeting led to further negotiations, prompted by SFI's interest in purchasing Quick Cash's entire operation. SFI's offer to acquire 100 percent of Quick Cash—which would include Mr. Delgado sitting on the board of SFI—was appealing to the Delgados, so instead of closing their original deal, Quick Cash and SFI signed a new purchase agreement. Under the new agreement SFI was to buy all of Quick Cash's assets or stock (the record does not indicate which) for $13.5 million, with a closing date of July 1, 2014. The new agreement was finalized on May 13, 2014. On the same day, Quick Cash borrowed an additional $500,000 from SFI.

Quick Cash's loans from SFI were personally guaranteed by the Delgados and secured by Quick Cash's assets.

Between March and November 2014, customers of Quick Cash brought a number of actions against it, alleging violations of the federal Truth in Lending Act. Several lawsuits were brought in Gallup and a class action was brought in federal court in New Mexico. The class action lawsuit was filed ten days after SFI and Quick Cash signed the May 13, 2014, purchase agreement.

The lawsuits were front page news in Gallup for four days. Owing partly to publicity and partly to word of mouth (Quick Cash's customers are part of a close-knit Gallup community), Quick Cash began to have some difficulty collecting from its customers.

In mid-2014, after Quick Cash failed to settle the class action lawsuit, SFI backed out of the purchase agreement. This left Quick Cash owing SFI $4 million, with monthly interest payments of $20,000 and a maturity date of December 31, 2018. To recapitalize the business, the Delgados turned to friends and business acquaintances for a new round of loans. From July 2014 through April 2015, Quick Cash borrowed about $2 million from these sources. Quick Cash managed to make a $548,000 profit in 2014.

Ultimately, however, Quick Cash was not able to work its way out of the problems caused by the lawsuits. On July 6, 2015, Quick Cash filed this case under chapter 11. On the petition date, Quick Cash's total liabilities were scheduled as $7,067,815.61, and its total assets were scheduled as $9,662,518.06.

The United States Trustee's office appointed a Committee of Unsecured Creditors (UCC), and also a Consumer Claimants Committee (CCC), representing claimants with pending lawsuits against Quick Cash.

On March 16, 2016, Quick Cash, SFI, and the committees agreed on the terms of a plan of reorganization. For reasons not in the record, Quick Cash later backed out of the deal.

On December 29, 2016, the CCC filed a motion to convert the case to chapter 7. The motion was strongly opposed by SFI and the UCC, who preferred to give Quick Cash "the opportunity to succeed" in reorganizing.[4] The motion was denied on March 22, 2017.

---

[4] SFI argued that the CCC's motion to convert was not in the best interest of creditors and was motivated by a desire to run Mr. Delgado out of business, assist the consumer protection lawyers representing the plaintiffs in the cases against Quick Cash, and/or punish Mr. Delgado.

In an order entered June 29, 2017, the Court granted the CCC authority to file fraudulent transfer claims on behalf of the bankruptcy estate and ordered that if the case converted to chapter 7, the chapter 7 trustee would be substituted for the CCC in the adversary proceeding. This adversary proceeding followed.

On June 30, 2017, Quick Cash moved to dismiss its chapter 11 bankruptcy case. A week later, the CCC filed a second motion to convert the case to chapter 7. The conversion motion was granted, and the motion to dismiss denied, on August 11, 2017.

Yvette Gonzales was appointed chapter 7 trustee. She filed an amended complaint in this proceeding on November 1, 2017. By her amended complaint the trustee seeks to recover $1,273,027.09 from the Delgados that Quick Cash transferred to third parties for the benefit of the Delgados. The Transfers were booked as shareholder distributions. Approximately 650 transfers, ranging from $2.47 to $18,421.30 are at issue (together, the "Transfers").[5] The Transfers were made between July 2, 2013 and June 29, 2015 (the "Transfer Period").

By the trial date, all claims against the defendants other than the Delgados had been settled or dismissed.[6] Further, at trial the trustee stipulated to the dismissal of all claims against the

---

[5] The amended complaint also refers to $98,832 in salary paid to Mr. Delgado, $18,962.18 in health care insurance premiums paid for Mr. Delgado, and $15,000 paid to the New Mexico Taxation and Revenue Department on Mr. Delgado's behalf. There is no real question that these payments were reasonable compensation to Mr. Delgado for two years' work as Debtor's CEO. They are not subject to avoidance and therefore are not included in the definition of the Transfers.

[6] The sole exception is Defendant Fidelity and Guarantee Life Insurance Company, which did not answer the complaint. Off the record, counsel for the trustee indicated that the trustee would seek a default judgment against this party.

Delgados except Counts II, V, and VI.[7] Finally, the trustee stipulated that her claims are based on the premise that Quick Cash was "balance sheet" insolvent during the Transfer Period.

## II. DISCUSSION

A. The Trustee's Claims.

1. Count II. Count II seeks to avoid the Transfers under § 548(a)(1)(B),[8] which allows avoidance of a transfer made, or obligation incurred, by the debtor within two years before the petition date if the debtor:

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; *and*
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

2. Count V. Count V seeks to avoid the Transfers under NMSA § 56-10-19(A), which provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Section 544(b)(1), commonly known as the 'strong-arm statute,' allows the trustee to pursue state fraudulent transfer laws. *See, e.g., In re Expert South Tulsa, LLC*, 534 B.R 400, 408 (10th Cir. BAP 2015), aff'd, 842 F.3d 1293 (10th Cir. 2016)).

---

[7] At trial the Court reviewed the amended complaint with the parties, count-by-count. Initially, the trustee's counsel limited the claims at issue to Counts II, IV, V, VI, IX, and X. Count IV is not based on "balance sheet" insolvency so the trustee elected not to pursue the claim at trial. Count IX is a duplicate of Count VI and was not pursued. Count X is a duplicate of Count V and was not pursued, leaving only Counts II, V, and VI.
[8] Unless otherwise noted, all statutory references are to 11 U.S.C.

3. <u>Count VI</u>. Count VI seeks to avoid the Transfers under NMSA, § 56-10-19(B), which provides:

> A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for the antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

This state preferential transfer statute has a one-year "look back" period. *See* NMSA § 56-10-23(C).

There is no question that the Delgados received or benefited from the Transfers, nor that Quick Cash did not receive reasonably equivalent value in exchange for them, nor that the Delgados were insiders of Quick Cash, nor that the Delgados are appropriate targets for the recovery of the Transfers.[9] However, the trustee did not put on any evidence that the Transfers were used to pay antecedent debts, so she did not carry her burden of proving Count VI. For Counts II and V, the only issue is whether Quick Cash was insolvent during the Transfer Period.

B. <u>Insolvency</u>.

Insolvency is a fact issue, *In re Mama D'angelo, Inc.*, 55 F.3d 552, 555 (10th Cir. 1995), and the burden of proving insolvency falls on the trustee. *In re Adam Aircraft Indus., Inc.*, 510 B.R. 342, 352 (10th Cir. BAP 2014); *First Nat'l Bank in Albuquerque v. Abraham*, 639 P.2d 575, 579 (N.M. 1982) (the creditor has the burden of proving a fraudulent conveyance claim).

In the Bankruptcy Code, insolvency is defined as having a financial condition where liabilities exceed assets. § 101(32)(A) ("The term 'insolvent' means . . . [a] financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair

---

[9] *See, e.g.*, § 550 (the trustee has the right to recover the value of avoidable transfers from a person for whose benefit the transfer was made).

valuation[.]"); *see also Adam Aircraft*, 510 B.R. at 352-53 (citing the definition and referring to it as the "balance sheet" test).

Similarly, in New Mexico, "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." NMSA § 56-10-16(A).

One simple measure of a transferor's solvency is the price "a buyer would be willing to pay for the debtor's entire package of assets and liabilities[.] If the price is positive, the firm is solvent; if negative, insolvent." *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992). Lacking such evidence, the analysis of the "fair value" of a debtor's property begins with the determination whether an entity should be valued as a going concern or by its liquidation value. *Mama D'angelo*, 55 F.3d at 555-56; *In re Helig-Meyers Co.*, 319 B.R. 447, 457 (Bankr. E.D. Va. 2004); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 131 (Bankr. D. Mass. 1989); *In re Fisher*, 575 B.R. 640, 645 (Bankr. M.D. Pa. 2017); *see In re Commercial Fin. Servs., Inc.*, 2005 WL 6499290, *14 (Bankr. N.D. Okla.) (the decision to assess an entity as a going concern or using a liquidation value "is legally binary"). "A commercial enterprise is a going concern if it is actively engaged in business with the expectation of indefinite continuance." *In re Payless Cashways, Inc.*, 290 B.R. 689, 702 (Bankr. W.D. Mo. 2003) (citing Black's Dictionary 278 (1996 ed.)); *see also In re Enron Corp.*, 2005 WL 6237551, at *25 (Bankr. S.D. Tex.) (citing *Payless*); *In re Commercial Financial Services, Inc.*, 350 B.R. 520, 544 (Bankr. N.D. Okla. 2005) (citing *Payless*).

"The going concern threshold is very low; a debtor may be financially unstable, but it is still a going concern as long as the amount it could realize from converting its assets to cash in the ordinary course of business exceeds the expenses of conducting business." *Heilig-Meyers*, 319 B.R. at 457; *see also Mama D'angelo*, 55 F.3d at 556 ("a business need not be thriving to receive

-8-
Case 17-01051-t    Doc 124    Filed 08/27/20    Entered 08/27/20 15:25:21 Page 8 of 13

a going concern value"). In other words, unless the business is "on its deathbed," a going concern valuation likely is appropriate. *See, e.g, In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1970) ("'We grant that going-concern value is not the proper standard if the business is 'on its deathbed.'"); *In re HDD Rotary Sales, LLC*, 499 B.R. 542, 551 (Bankr. S.D. Texas 2013) (same); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) (same); *In re Hoffinger Indus., Inc.* 313 B.R. 812, 818 (Bankr. E.D. Ark. 2004) (same). This is so even if the entity enters bankruptcy for the purpose of restructuring. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998) (unless "liquidation in bankruptcy" was "clearly imminent on the date of the challenged transfer" the debtor's assets should be valued on a going concern basis); *Heilig-Meyers*, 319 B.R. at 458 (contrasting a "business on its deathbed," which is forced to liquidate after making preferential transfers with a business that is operating as a going concern even after filing bankruptcy).

Conversely, "[l]iquidation value is appropriate if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic." *Mama D'angelo,* 55 F.3d at 555-56. A business without a "realistic capacity" to survive as a going concern should be valued under the liquidation formula. *Id.* at 556.

"The calculation of insolvency is often technical and will require expert testimony as to the value of the assets and the exposure on the liabilities." 5 Collier on Bankruptcy, ¶ 548.05[3][b] (16th ed.).

C.  <u>The Trustee Did Not Carry Her Burden of Proving Quick Cash's Insolvency</u>.

Conceding that Quick Cash's bankruptcy schedules reflect solvency on the petition date, the trustee argued that the values of six of its largest assets were significantly overstated. In the

trustee's view, Quick Cash's assets on the petition date, which were scheduled at $9,662,518.06, were worth only $1,947,815.10. The trustee presented the following valuation estimates:[10]

| Asset | Scheduled Value | Trustee's "Realistic Value" |
|---|---|---|
| Consumer Loans | $5,918.096.89 | $1,000,000 |
| Loan to Gardenia | $ 58,894.74 | $0 |
| Loan to Cash Cow Investments | $ 223,116.52 | $0 |
| Loan to Cash Cow Auto Sales | $1,736,529.84 | $ 100,000 |
| Auto Repair Equipment | $ 88,225.00 | $ 75,225 |
| Furniture Inventory | $1,081,331.21 | $ 216,266.24 |
| TOTALS | $9,106,194.20 | $1,391,491.24 |

The problem with the trustee's revised asset values for the consumer loans and the furniture inventory is that they are liquidation values rather than going concern values. If these two assets are valued at going concern values on the petition date, then Quick Cash was solvent even if the trustee's other adjustments are accurate.[11]

1.  *Going Concern Value is the Appropriate Value During the Transfer Period.* There is no evidence that Quick Cash was "on its deathbed" during the Transfer Period, such that liquidation value, rather than a going concern value, would be the appropriate method of valuation. In 2013 through the beginning of 2014, the unrefuted evidence is that Quick Cash was a profitable business, worth $13.5 million. By the end of 2014 Quick Cash, albeit facing several lawsuits, was operating and making a profit. When Quick Cash filed this case in July 2015 it was a going concern. It operated as a debtor in possession for more than two years. Seventeen months after the petition date SFI still believed in Quick Cash's continued viability and opposed conversion to

---

[10] The trustee did not challenge Quick Cash's value of 15 asset categories, scheduled at $556,323,86.

[11] It is not clear all of the trustee's other adjustments are accurate. While it seems reasonable to ascribe little value to the inter-company loans to Gardenia, Cash Cow Investments, and Cash Cow Auto Sales as of October 2015, when Mr. Delgado's deposition was taken, the trustee did not present evidence about when those loans became uncollectible. It seems likely they were collectible well into, and perhaps throughout, the Transfer Period.

chapter 7. Quick Cash's success in 2013, its continued profitability in 2014, and its post-petition operations show that going concern value, not liquidation value, is the appropriate way to value its assets during the Transfer Period.

While Quick Cash's accounts receivable likely were not 100% collectible, even as a going concern,[12] there is no evidence of what a realistic going concern value was during the Transfer Period. Accountants with expertise in valuing accounts receivable could have provided reliable valuation estimates. *See e.g.*, *In re Utility Stationery Stores, Inc.*, 12 B.R. 170, 174 -75 (Bankr. N.D. Ill. 1981) (discussing a CPA's valuation method for accounts receivable). No such testimony was offered.

At some point, most likely post-petition, Quick Cash was "on its deathbed" and a liquidation value of its assets would be proper. During the Transfer Period, on the other hand, the evidence supports the use of a going concern value. Using a going concern value results in Quick Cash's balance sheet solvency during most or all of the Transfer Period. Even if Quick Cash slipped into insolvency at some point during the Transfer Period, the Court has no way of knowing when that might have happened.

2. <u>The Trustee's Evidence in Support of Using a Liquidation Value is Not Persuasive</u>. In support of her balance sheet insolvency argument, the trustee relied entirely on Mr. Delgado's October 2015 deposition testimony,[13] and in particular on the following:

Q. . . . if [SFI] repossessed the assets, what do you think it could get from them?

---

[12] Accounts receivable may be discounted under the fair valuation standard if, for example, "there is little likelihood of collecting from the obligors, if the obligors dispute the validity of the debtor's claims, or if the obligors have other defenses to the debtor's claims." Gerald L. Blanchard & Rodney A. Morris, 2 Problem Loan Workouts, § 13:21 (2019); *accord* 2 Collier on Bankruptcy, ¶ 101.32[4] (16th ed.) (noting that prospect of collectability on the critical date, collectability within a reasonable time, and solvency of the obligors may inform value of accounts receivable).

[13] The deposition was not admitted at trial, but the trustee's counsel questioned Mr. Delgado about his deposition testimony on these points.

> A. Well, that would be their decision. At that point, I would feel free. What would they get, they would get maybe 20 cents on the dollar.
> Q. On their 4 million-dollar debt?
> A. Correct.
> Q. They would get about 20 cents collected, you think?
> A. I don't know. It is hard to say, but yeah, I would say.
> Q. That is your best estimate?
> A. If they got a million bucks they hit a home run.
> . . . .
>
> Q. . . . the inventory that Quick Cash has on hand?
> A. Yes.
> Q. Million dollars, approximately.
> A. Correct.
> Q. Okay. If you had to liquidate that as opposed to selling it over time, do you have an estimate of how much could you get in liquidation?
> A. My best guess is just based on experience and we have tried to liquidate at the end of the year and we are lucky to get 50 percent or, you know, everybody wants a bargain especially if they think you are going out of business, they definitely want a bargain.
> Q. You had said, I though, 20 percent before?
> A. Well, that is what I—yeah I said we are lucky to get 50 percent.
> Q What do you think you would get most likely as opposed to if you are lucky?
> A. From a business perspective, I think you would get 20 percent.
> Q. Okay. What do you mean from a business perspective?
> A. Just experience, understanding—
> Q. Okay.
> A. –the market.

Mr. Delgado was responding to questions about the liquidation value of Quick Cash's assets if it were forced to "close its doors" in October 2015. There are several problems with relying on this testimony. First, the premise is questionable; when the deposition was taken Quick Cash was operating and had no intention of shutting down. There is no evidence that Quick Cash was "on its deathbed" in October 2015. Second, a hypothetical liquidation value in October 2015 bears no relation to a going concern value in 2013 or 2014. Finally, Mr. Delgado's answers were given without the benefit of any research, preparation, or careful thought. He answered a number of hypothetical questions as best he could, but his "off-the-cuff" opinions about October 2015 liquidation values are not reliable evidence of insolvency during the Transfer Period.

Mr. Delgado emphasized, both in his deposition and later at trial, that Quick Cash's ability to collect its accounts receivable and sell its furniture for good prices hinged on continued operations. In Mr. Delgado's opinion, Quick Cash had to stay open to collect its receivables and get a reasonable value for its assets. His opinion reinforces the idea that, during the Transfer Period, Quick Cash's consumer loans ought to be valued using a going concern value.

### III. CONCLUSION

The trustee did not carry her burden of proving that Quick Cash was insolvent during the Transfer Period. The Delgados therefore are entitled to a judgment in their favor on all counts of the trustee's amended complaint. The Court will enter a separate final judgment.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: August 27, 2020
Copies to: counsel of record